J-A15039-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| WILLIAM KATES AND BEVERLY KATES, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellees | |
| v. | |
| DOYLESTOWN HOSPITAL, ET AL., | |
| Appellant | No. 2718 EDA 2013 |

Appeal from the Order Entered August 15, 2013
In the Court of Common Pleas of Bucks County
Civil Division at No(s): 2011-02516

BEFORE:  PANELLA, LAZARUS AND JENKINS, JJ.

MEMORANDUM BY JENKINS, J.                    **FILED AUGUST 22, 2014**

Doylestown Hospital ("the Hospital") has appealed from an order dated August 15, 2013 directing the Hospital to provide various records to appellees, William and Beverly Kates ("the Kates").  The Hospital alleges that the documents are privileged under the Peer Review Protection Act ("PRPA"), 63 P.S. § 425.1 et seq.  We disagree with the Hospital, and we affirm.

The Kates allege in this action that various medical defendants, including the Hospital, failed to timely diagnose William Kates' stroke. During discovery, the Kates demanded that the Hospital produce documents that the Hospital's employee, Ms. Benner, reviewed in preparation for her deposition.  Ms. Benner is a member of the Hospital's Stroke Committee, which establishes procedures for the operation of the Hospital's stroke

1

program and reviews these procedures and the program's operation for compliance with accreditation by the Joint Commission on Accreditation of Healthcare Organizations ("JCAHO").

On April 11, 2013, the Kates filed a motion to compel the Hospital to produce the documents in dispute. In response, the Hospital submitted the following documents under seal to the court for in camera review:

- Document 1 is an email regarding which hospital personnel had completed the American Stroke Association's NI1-1 Stroke Scale program.

- Document 2 is an email regarding enhancements the radiologists made to the night hawk program (which deals with off hours x-ray review).

- Document 3 is the Agenda of the Critical Care Quality Sub-Committee of the Patient Safety Committee.

- Documents 4 through 11, 19 and 20 are email chains regarding the Stroke Committee's Minutes, which deal with the procedures to be used for the operation of the stroke program.

- Documents 12, 13, 16 through 18 and 21 are e-mail chains between Stroke Committee members concerning practices and procedures the hospital will use in the operation of its stroke program.

- Documents 14 and 15 detail the security of Hospital as it deals with stroke and disabled patients at the hospital.

- Documents 22 and 23 are e-mail chains between Stroke Committee members and a Jefferson University administrator exchanging the transfer agreement (which cannot be seen) between the two hospitals.

- Documents 24-26 are email chains regarding the procedures used for 'consults' or orders for 'consults' for stroke patients (consults are requests by one doctor to another asking for their input on the treatment of a patient).

- Document 27 is an email setting forth the topics (procedures and practices) the Stroke Committee will need to be prepared to discuss in an upcoming phone call.

J-A15039-14

Trial Court Opinion, pp. 3-4[1].

On August 8, 2013, the court held a hearing on the Kates' motion to compel. On August 15, 2013, the court ordered the Hospital to produce the above list of documents. The Hospital filed a timely appeal from the portions of the order granting the Kates' motion to compel. The Kates did not appeal the portions of the order that permitted the Hospital to withhold several documents from production.

The Hospital has the right to take an interlocutory appeal of this discovery order pursuant to the collateral order doctrine embodied in Pa.R.A.P. 313. *Gillard v. AIG Ins. Co.*, 15 A.3d 44, 56 (Pa.2011) (collateral order doctrine permits appeal from discovery order requiring disclosure over assertion of privilege). Our standard of review over appeals from orders interpreting the PRPA is plenary. *Dodson v. DeLeo*, 872 A.2d 1237, 1241 (Pa.Super.2005).

The lone issue on appeal is whether PRPA shields from production the documents that the trial court ordered the Hospital to produce.

The trial court observed that the PRPA's purpose is to improve the quality of care, reduce mortality and keep healthcare costs within reasonable

---

[1] To eliminate confusion, we do not list the documents that the court found were not subject to production.

- 3 -

bounds. Trial Court Opinion, p. 6. To achieve these goals, there must be honest and sometimes critical internal review of medical providers by their peers. *Id*. The PRPA deems many internal review documents privileged to facilitate accurate and comprehensive internal evaluations of medical providers.

The trial court observed, however, that the PRPA has two important limitations. The first limitation is that only the "proceedings and records of a *review committee*" are exempt from discovery. 63 P.S. § 425.4 (emphasis in original). A review committee (also called a "review organization") is "any committee engaged in peer review, including…gather[ing] and review[ing] information relating to the care and treatment of patients." 63 P.S. § 425.2. It also means "any hospital board, committee or individual reviewing the professional qualifications or activities of its medical staff or applicants for admission thereto." *Id.* Peer review, in turn, is defined in pertinent part as

> the procedure for evaluation by professional health care providers of the quality and efficiency of services ordered or performed by other professional health care providers,… and the compliance of a hospital, nursing home or convalescent home or other health care facility operated by a professional health care provider with the standards set by an association of health care providers and with applicable laws, rules and regulations.

63 P.S. § 425.2. The second limitation is the "original source exception" under 63 P.S. § 425.4, which provides:

> Provided, however, that information, documents or records otherwise available from original sources *are not to be construed as immune from discovery or use in any such civil action merely because they were presented during proceedings of such committee*, nor should any person who testifies before such committee or who is a member of such committee be prevented from testifying as to matters within his knowledge, but the said witness cannot be asked about his testimony before such a committee or opinions formed by him as a result of said committee hearings.

*Id.* (emphasis added). Under this limitation, a hospital may not shield a document from production merely by giving it to a peer review committee. A document not derived from nor part of an evaluation or review by a peer review committee is not privileged. *Dodson*, *supra*, 872 A.2d at 1244.

Read together, the trial court reasoned, the two limitations provide that "only documents both generated and used exclusively by a peer review committee during a peer review process are deemed confidential." Trial Court Opinion, p. 8.

The trial court held that the documents that it ordered the Hospital to produce do not relate to peer review. Instead, the court said, the Hospital simply labeled them privileged without good reason:

> Peer review necessarily involves evaluating the quality of care provided by medical professionals or evaluating the qualifications of medical care providers. Except for those portions that we held could be redacted, the documents/communications at issue were not used or made for the determination of staff privileges or for credentialing

- 5 -

> purposes. These documents/communications were not used exclusively for quality assurance purposes by the Stroke Committee and are not incorporated exclusively within a physician's credentialing file. ***See Dodson, supra***. Furthermore, Doylestown Hospital cannot point to a definitive action initiating the peer review process prior to the time these documents were created. ***See Mazzucca [v. Methodist Hospital]***, 47 D. & C. 3d [55,] 60 [(Phila. Cty. 1985)]. Quite simply, the emails, agenda and minutes we ordered discoverable are non-peer review business records and communications that are neither used, nor generated by the Stroke Committee for peer review purposes.

***Id***., pp. 8-9. The court held that "setting up the hospital's policies and procedures for the operations of its stroke program or monitoring changes with the Joint Commission's standards [does not] constitute[] a peer review process. . . especially if those procedures relate to discussing the Joint Commission's publically published standards of accreditation." ***Id.***, pp. 9, 11.

The court continued:

> [T]he Kates' Motion for Production of Documents does not request any reports, documents or recommendations produced by the Joint Commission or exchanged between the Joint Commission and Doylestown Hospital: (1) The Motion requests minutes of the Stroke Committee in 2009 (2) The motion requests documents reviewed by Benner prior to the deposition, and (3) The Motion requests emails between Benner and the Stroke Committee. Furthermore, our Order explicitly exempts any documents, communications or evaluations produced by the Joint Commission or exchanged between the Joint Commission and Doylestown Hospital.

- 6 -

*Id*., p. 10.

The court concluded:

> We certainly are aware that the Joint Commission's peer review procedures may overlap with the Stroke Committee's separate or related peer review procedures. For instance, our in camera review of the disputed documents helped us identify and protect from discovery certain portions of the Stroke Committee minutes that involved actual peer review. Document 8, item 2.a, and Document 10, item 2, both are minutes that detail the Stroke Committee's report and discussions on problems regarding the efficiency and quality of care provided by medical personnel. We allowed those portions to be redacted. We are reluctant, however, to extend this same exemption to other information relating to the Stroke Committee's function of setting up the Stroke Program's policies and procedures[,] especially if those procedures relate to discussing the Joint Commission's publically published standards of accreditation.
>
> [The] Hospital would like the PRPA's confidentiality provision to extend to all communications of the Stroke Committee as well as every document derived by the Stroke Committee. Permitting such a broad request would be a clear misuse of the PRPA's confidentiality provision because it would allow hospitals to insulate their policy making decisions under the guise of peer review. It is beyond the PRPA's plain meaning.
>
> Therefore, [the] Hospital did not meet its burden of establishing that the scope of the PRPA's confidentiality provision extends to the documents and communications our order requires it to disclose.

*Id*., p. 11.

We have carefully reviewed the record, the briefs of both parties, and the documents that are the subject of this appeal. We agree with Judge McMaster's interpretation of the PRPA and his application of the PRPA to this case. Therefore, we affirm the trial court's order.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/22/2014

J-A 15039-14

## IN THE COURT OF COMMON PLEAS OF BUCKS COUNTY, PENNSYLVANIA
## CIVIL DIVISION

William Kates               :           NO.:   2011-02516
Beverly Kates, h/w         :
                                  :
             v.                 :
                                  :
Doylestown Hospital, et al.     :

## OPINION

This is an appeal of an order, dated August 15, 2013, relating to an *in camera* review of documents allegedly privileged from discovery. Defendant Doylestown Hospital filed its Notice of Appeal on September 13, 2013.

This matter began when Plaintiffs, Beverly and William Kates, h/w (collectively "the Kates"), filed a professional liability claim against Doylestown Hospital and a multitude of other Defendants. The Kates allege negligent care of William Kates after he suffered a stroke and was treated at Doylestown Hospital. The instant appeal, however, is interlocutory and is exclusively between the Kates and Doylestown Hospital.

The issue is whether the parameters of the Peer Review Protection Act ("the PRPA"), 63 P.S. § 425.1 *et seq.*, exempt from discovery inter-office emails, minutes and agenda of a hospital committee, which at times engages in review of the hospital's services, when the alleged confidential documents relate to planning stroke program procedures and discussing a joint commission's peer review standards. Simply put, we ordered that all documents unrelated to "peer review" are discoverable.

We found that Doylestown Hospital failed to establish that the alleged committee in question functioned as a 'review organization' pursuant to 63 P.S. § 425.2 when it was establishing stroke program procedures and discussing the establishment of procedures to comply with joint commission standards. In addition, the documents in question are not derived as part of a proceeding

1

held for peer review purposes. We determined, on the other hand, that the joint commission was a "review organization" engaged in "peer review." Accordingly, our Order exempts from discovery all proceedings/documents between Doylestown Hospital and the joint commission as well as specific portions of the committee minutes that did involve situations where the committee was engaging in its own "peer review." It should be noted that Doylestown Hospital's accreditation by the joint commission as a primary stroke program is relatively recent.

## BACKGROUND

The Kates filed their complaint on March 16, 2011. The next event relevant to this appeal occurred on March 8, 2013, when the Kates took a discovery deposition of Doylestown Hospital employee Cathy Benner ("Benner") who refused to produce certain documents she reviewed in preparation for her deposition. Doylestown Hospital maintained that these documents were exempt from discovery pursuant to the PRPA.

Benner is a member of a Doylestown Hospital committee named "The Stroke of 4" ("the Stroke Committee") that oversees Doylestown Hospital's Stroke Program. The Stroke Committee establishes procedures for the operation of Doylestown Hospital's Stroke Program and reviews those procedures and the operation of the Stroke Program for compliance with joint commission ("the Joint Commission") accreditation. Doylestown Hospital was certified as a primary stroke program by the Joint Commission at the time of Benner's role in the Stroke Committee.

The Kates subsequently requested such documents be produced on April 11, 2013. In addition, the Kates requested emails between Benner and other specific Doylestown Hospital Stroke Program employees as well as meeting minutes of the Stroke Committee in 2009. (Motion for the Production of Documents Order, 4/11/13, at 4). We determined that this discovery request was sufficiently specific and definite and issued an order requiring Doylestown Hospital's compliance. (Order, 5/3/2013) Doylestown Hospital subsequently

2

filed a response requesting that the Kates' Motion for Production be denied. (Reply, 5/24/2013).

On August 8, 2013, a hearing was held on the matter. After oral argument, we instructed Doylestown Hospital to provide us with a sealed copy for *in camera* review (a sealed copy of the documents is attached). We have changed Doylestown Hospital's numbering sequence for clarity and the documents are described as follows:

- Document 1 is an email regarding which hospital personnel had completed the American Stroke Association's NIH Stroke Scale program.

- Document 2 is an email regarding enhancements the radiologists made to the night hawk program (which deals with off hours x-ray review).

- Document 3 is the Agenda of the Critical Care Quality Sub-Committee of the Patient Safety Committee.

- Documents 4 through 11, 19 and 20 are email chains regarding the Stroke Committee's Minutes, which deal with the procedures to be used for the operation of the stroke program.

- Documents 12, 13, 16 through 18 and 21 are email chains between Stroke Committee members concerning the practices and procedures the hospital will use in the operation of its stroke program.

- Documents 14 and 15 detail the security of Doylestown Hospital as it deals with stroke and disabled patients in the hospital.

- Documents 22 and 23 are email chains between Stroke Committee members and a Jefferson University administrator exchanging the transfer agreement (which cannot be seen) between the two hospitals.

- Documents 24 through 26 are email chains regarding the procedures used for "consults" or orders for "consults" for stroke patients. (Consults

3

are requests by one doctor to another asking for their input on the treatment of a patient).

- Document 27 is an email setting forth the topics (procedures and practices) the Stroke Committee will need to be prepared to discuss in an upcoming phone call.

We found that almost none of the communications and documents concern the Stroke Committee engaging in peer review procedures. We determined that only two portions of Documents 8 and 10 contained peer review communications and information that should be exempt from disclosure. Also, no document was a communication with the Joint Commission and no document was exchanged between the Joint Commission and Doylestown Hospital. On August 15, 2013, we crafted an order to effectuate our findings. (Order, 8/15/2013, 1-2). On August 29, 2013, Doylestown Hospital filed a Motion for Reconsideration, which we subsequently denied, and later they filed their Notice of Appeal challenging our Order.

STATEMENT OF MATTERS COMPLAINED OF ON APPEAL

Doylestown Hospital filed their Notice of Appeal on September 13, 2013. On September 17, 2013, we ordered Doylestown Hospital to file, within 21 days of our Order, a Concise Statement of Matters Complained of on Appeal as required by Pa.R.A.P. § 1925(b). Doylestown Hospital subsequently filed their Statement of Matters Complained of on Appeal on October 2, 2013. Doylestown Hospital raises one issue for review:

> By prior Order entered August 15, 2013, the Court granted Plaintiff's Motion to Compel and denied Defendant's Motion for Protective Order, and also ordered the production of certain documents. Defendant believes that the documents at issue are protected by the Peer Review Protection Act, 63 P.S. § 425.1, et seq., and other principals providing for privilege and confidentiality, including but not limited to Pa.R.C.P. 4003.1(a) & 4011. Thus, the documents at issue are not subject to discovery.

4

STANDARD OF REVIEW

When a trial court's evidentiary ruling pertains to a question of law, an appellate court's review is plenary. *Dodson v. Deleo*, 872 A.2d 1237, 1241 (Pa.Super. 2005) (quoting *Zieber v. Bogert*, 773 A.2d 758 (2001)). The Superior Court's review is *de novo* when the issue involves statutory interpretation of the PRPA. *See Dodson, supra*.

DISCUSSION

Doylestown Hospital has not established that the documents at issue are confidential pursuant to the PRPA. We determined that the parameters of the PRPA do not extend to the Stroke Committee's inter-office emails, agenda and minutes that discuss how the hospital intends to operate its stroke program and how it intends to comply with the Joint Commission's standards. This is because for those types of activities the Stroke Committee did not act as a "review organization" engaged in "peer review". Also, no document is a communication with the Joint Commission and no document relates to information gathered for the Joint Commission. Finally, the documents/communications do not involve the Stroke Committee engaging in its own peer review process. As a result, our Order should be upheld.

Initially, we note that Doylestown Hospital raises a proper issue for interlocutory appeal due to the PRPA's underlying policy concerns and the alleged confidential nature of the documents at issue. *See Troescher v. Grody*, 869 A.2d 1014, 1017 (Pa.Super. 2005); *See also Dodson v. Deleo*, 872 A.2d 1237, 1240-1241 (Pa.Super. 2005).

Applying the language of the PRPA to a particular set of facts has proven to be a challenging exercise for many courts due to the PRPA's language and construction. Certain guideposts exist that shed light on the scope and limitations of the PRPA. As a result, we must examine the policy concerns and purpose of the PRPA to provide a more detailed portrait of the legislative intent accompanying the PRPA's enactment.

5

When interpreting a statute our primary concern is to effectuate the legislature's intent in enacting the statute. 1 Pa.C.S. § 1921(a). If the statute is unambiguous, the drafter's intent must be gleaned from its plain language instead of the pretext of pursuing a statute's spirit. 1 Pa.C.S. § 1921(a); *See also Hayes v. Mercy Health Court*, 739 A.2d 114, 116 (Pa. 1999) (citing *Cooper v. Delaware Valley Medical Center*, 654 A.2d 547 (Pa. 1995)).

The purpose of the PRPA is to (1) improve the quality of care rendered, (2) reduce mortality and (3) keep healthcare costs within reasonable bounds. 63 P.S. § 425.2. The need for confidentiality in the peer review process stems from the need for comprehensive, honest, and sometimes critical evaluations of medical providers by their peers in the profession. *See O'Neill v. McKeesport Hospital*, 48 D. & C.3d 115 (Allegheny Co. 1987). There are two important limitations, however, to the PRPA's extension of confidentiality and both are found within the plain language of 63 P.S. § 425.4 ("Section 4").

The first limitation originates from the initial provision of Section 4, which labels peer review communications between health care professionals as confidential and provides:

> The proceedings and records of a review committee shall be held in confidence and shall not be subject to discovery or introduction into evidence in any civil action against a professional health care provider arising out of the matters which are the subject of evaluation and review by such committee and no person who was in attendance at a meeting of such committee shall be permitted or required to testify in any such civil action as to any evidence or other matters produced or presented during the proceedings of such committee or as to any findings, recommendations, evaluations, opinions or other actions of such committee or any members thereof...

63 P.S. § 425.4 (emphasis added).

The emphasized phrase is important because it plainly indicates that only a review committee's actions, referred to as a "review organization" pursuant to 63 P.S. § 425.2, should be deemed confidential. A review organization is defined as "any committee engaged in peer review, including...

6

to gather and review information relating to the care and treatment of patients..." 63 P.S. § 425.2 (emphasis added). "Peer review" is defined, in pertinent part, as follows:

> the procedure for evaluation by professional health care providers of the quality and efficiency of services ordered or performed by other professional health care providers, including... and the compliance of a hospital, nursing home or convalescent home or other health care facility operated by a professional health care provider with the standards set by an association of health care providers and with applicable laws, rules and regulations.

63 P.S. § 425.2.

In *Cooper v. Delaware Valley Medical Center*, 654 A.2d 547 (Pa. 1995), the Supreme Court of Pennsylvania outlines the competing interests associated with the PRPA, as well as the purpose of peer review in general, as follows:

> Peer review can best be understood if one realizes that in most cases doctors with hospital privileges are not employees of the hospital, instead, they are independent contractors who must be granted permission to admit patients and make use of the hospital's resources. A physician receives permission to use the hospital when he receives a vote of approval from his colleagues. Peer review is the common method for exercising self-regulatory competence and evaluating physicians for privileges. The purpose of this privilege system is to improve the quality of health care, and reflects a widespread belief that the medical profession is best qualified to police its own. Thus, it is beyond question that peer review committees play a critical role in the effort to maintain high professional standards in the medical practice.

> The goal of protecting patients and the general public from less than competent physicians is balanced against the rights of the private physician. The worst possible punishment for a physician is a denial of privileges based upon a physician's poor performance, inferior qualifications, or disruptive behavior. Finding gainful employment in the hospital setting after a poor review is unlikely...

*Cooper*, 654 A.2d at 551 (citations & quotations omitted).

The second limitation of the PRPA's extension of confidentiality, which immediately follows Section 4's confidentiality provision, is referred to as the "original source exception." The exception states as follows:

7

Provided, however, That information, documents or records otherwise available from original sources are not to be construed as immune from discovery or use in any such civil action merely because they were presented during proceedings of such committee, nor should any person who testifies before such committee or who is a member of such committee be prevented from testifying as to matters within his knowledge, but the said witness cannot be asked about his testimony before such a committee or opinions formed by him as a result of said committee hearings.

63 P.S. § 425.4.

Both limitations are boundaries to contain any unreasonable extension of the PRPA's grant of confidentiality. For instance, a hospital may not create protection for a document by simply giving a document to a peer review committee. *Dodson*, 872 A.2d at 1244 (citing *Atkins v. Pottstown Memorial Medical Center*, 634 A.2d 258 (Pa.Super. 1993)). A document not derived from nor part of an evaluation/review by a peer review committee does not fall within the need for confidentiality the statute was intended to provide. *Atkins*, 634 A.2d at 260. Instead, documents both generated and used exclusively by a peer review committee during a peer review process are deemed confidential. *See Dodson, supra.* In Pennsylvania, the law is well-settled, a party asserting a limitation to discovery bears the burden of establishing that limitation. *Mazzucca v. Methodist Hospital*, 47 D.&.C.3d. 55, 62-63 (Phila. Co.1986).

In this matter, it is apparent that Doylestown Hospital misapplies the meaning of Section 4 because the documents at issue do not relate to any type of peer review process. Simply labeling the Stroke Committee as a review organization does not end the inquiry. For instance, a document does not become protected by the PRPA merely by labeling a document as being protected. *See Treible v. Lehigh Valley Hosp. Inc.*, 75 Pa. D .& C.4th 22 (Lehigh Co. 2005). The substance of the Stroke Committee's functions, rather than the Stroke Committee's form or label determine whether peer review is taking place.

Peer review necessarily involves evaluating the quality of care provided by

8

medical professionals or evaluating the qualifications of medical care providers. Except for those portions that we held could be redacted, the documents/communications at issue were not used or made for the determination of staff privileges or for credentialing purposes. *See Young v. Western Pennsylvania Hospital*, 722 A.2d 153, 156 (Pa.Super.1998); *See also Troescher,* 869 A.2d 1014. These documents/communications were not used exclusively for quality assurance purposes by the Stroke Committee and are not incorporated exclusively within a physician's credentialing file. *See Dodson, supra.* Furthermore, Doylestown Hospital cannot point to a definitive action initiating the peer review process prior to the time these documents were created. *See Mazzucca,* 47 D.& C.3d. at 60. Quite simply, the emails, agenda and minutes we ordered discoverable are non-peer review business records and communications that are neither used nor generated by the Stroke Committee for peer review purposes. *See Atkins, supra; See also Hanzek v. McDonough,* 44 Pa. D. & C.3d 639, 645 (Lehigh Co. 1987).

Doylestown Hospital's sole argument rests on the Stroke Committee's perpetual existence as a review organization engaged in peer review merely because of their act of setting up the policies and procedures the hospital will use to insure that its stroke program will operate in compliance with the Joint Commission's standards. We certainly do not dispute the fact that the Joint Commission and the Stoke Committee can each be a review organization that at times is engaged in peer review pursuant to the PRPA. *See O'Neill,* 48 Pa. D. & C.3d 117 (Allegheny Co. 1987). We cannot agree, however, that setting up the hospital's policies and procedures for the operation of its stroke program or monitoring changes with the Joint Commission's standards constitutes a peer review process. Doylestown Hospital relies on two cases that are instructive yet unpersuasive to its position.

The first case is *Rosser v. Feldman,* 38 Pa. D. & C.4th 353 (1998). *Rosser* involves a defendant seeking a protective order from a plaintiff's discovery request for documents relating to a hospital's withdraw from a joint

9

commission. The plaintiff requested the production of <u>letters of deficiency from a joint commission to the hospital regarding the joint commission's inspection</u>. The plaintiff also requested the production of <u>a joint commission report</u> related to the hospital.

The second case is *O'Neill v. McKeesport Hosp.*, 48 Pa. D. & C.3d 115 (Allegheny Co. 1987). The facts in *O'Neill* are substantially similar to the facts in *Rosser*. In a medical malpractice suit, the plaintiff requested the production of documents, reports or recommendations <u>made by the joint commission or sent to the defendant by the joint commission</u>.

The *Rosser* court and the *O'Neill* court both determined that the documents at issue were not discoverable. The Kates' discovery request in this case, however, is significantly different then the discovery requests involved in *Rosser* and *O'Neill*. The Kates' Motion for Production of Documents does not request any reports, documents or recommendations produced by the Joint Commission or exchanged between the Joint Commission and Doylestown Hospital. (1) The Motion requests minutes of the Stroke Committee in 2009; (2) The Motion requests documents reviewed by Benner prior to the deposition; and (3) The Motion requests emails between Benner and the Stroke Committee. Furthermore, our Order explicitly exempts any documents, communications or evaluations produced by the Joint Commission or exchanged between the Joint Commission and Doylestown Hospital. We also find it telling that the *O'Neill* court explicitly narrowed its holding so that joint commission standards and the hospital's self-assessment of compliance with those standards were not interpreted as exempt pursuant to the PRPA. *O'Neill*, at 120.

We certainly are aware that the Joint Commission's peer review procedures may overlap with the Stroke Committee's separate or related peer review procedures. For instance, our *in camera* review of the disputed documents helped us identify and protect from discovery certain portions of the Stroke Committee minutes that involved actual peer review. Document 8, item 2.a, and Document 10, item 2, both are minutes that detail the Stroke

Committee's report and discussions on problems regarding the efficiency and quality of care provided by medical personnel. We allowed those portions to be redacted. We are reluctant, however, to extend this same exemption to other information relating to the Stroke Committee's function of setting up the Stroke Program's policies and procedures. Especially if those procedures relate to discussing the Joint Commission's publically published standards of accreditation.

Doylestown Hospital would like the PRPA's confidentiality provision to extend to all communications of the Stroke Committee as well as every document derived by the Stroke Committee. Permitting such a broad request would be a clear misuse of the PRPA's confidentiality provision because it would allow hospitals to insulate their policy making decisions under the guise of peer review. It is beyond the PRPA's plain meaning.

Therefore, Doylestown Hospital did not meet its burden of establishing that the scope of the PRPA's confidentiality provision extends to the documents, records and communications our Order requires them to disclose. Simply put, the documents are not documents/communications derived from a peer review process.

## CONCLUSION

Except for the limited portions that we allowed to be redacted, the documents in question do not involve either the evaluation of the quality of medical care provided by medical professionals or the evaluation of the qualifications of medical care providers. Therefore, they do not involve peer review.

BY THE COURT

_____
JAMES M. MCMASTER          J.

11-20-13
_____
DATE

11